IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-02380-MSK-BNB

RANDY E. KEYES,

        Plaintiff,

v.

ROBERT KRICK, and
JAN STUCKS,

        Defendants.

---

## OPINION AND ORDER GRANTING MOTION TO DISMISS

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Dismiss **(# 38)**, to which no responsive papers have been filed.

## FACTS

At the times relevant herein, Mr. Keyes was an inmate of the Federal Bureau of Prisons ("BOP"). Although both the narrative description and Mr. Keyes' specific description of his claims in the form complaint are somewhat skeletal, Mr. Keyes has attached a wealth of material to his Amended Complaint **(# 9)** as exhibits, including his own lengthy affidavit. Mindful of Mr. Keyes' *pro se* status, the Court will construe the affidavit, not simply the text of the Amended Complaint, as setting forth Mr. Keyes' allegations at issue here.

In July 2008, Mr. Keyes was accepted into the BOP's Residential Drug Abuse Program ("RDAP"), and shortly thereafter, began taking group classes led by Defendant Stucks. On

October 20 2008, Ms. Stucks distributed written treatment plans for each inmate in the class.[1]

Mr. Keyes took offense to a statement in his treatment plan to the effect that he had "a history of

. . . physical aggression as evidenced by the numerous serious assaults, stalking, and harassment

convictions depicted in my PSI [Presentence Investigation Report ]."

       According to Mr. Keyes, he had been previously been charged with stalking and

harassment, but those charges were later dismissed.  Mr. Keyes was particularly upset that his

prior attempts to correct this and other information in his inmate file had apparently been

unsuccessful.  Mr. Keyes "began to question [Ms.] Stucks as to how she could legally . . . release

false, fictitious, and inaccurate material information about my treatment plan."  In response, Ms.

Stucks "openly admitted in front of the entire RDAP class that she had read in my PSI that, at

one point in time in the past, I had charges pending for stalking and harassment and therefore she

assumed that I also had convictions for the crimes of stalking and harassment."  Mr. Keyes

believes that this statement placed his safety at risk, as his RDAP classmates, upon learning that

he had been charged (and possibly convicted of) stalking and harassment "looked upon [him] as

some sore of perverted predator and/or a sexual abused or even worse."[2]  Mr. Keyes states his

belief that Ms. Stucks' actions were specifically intended to cause other inmates to intend to

harm him, as Ms. Stucks had previously stated that she had worked as a prison guard "for a long

---

       [1]It is not clear whether the individualized treatment plans for each inmate were
distributed only to that inmate or whether each inmate in the class saw the treatment plans
drafted for all other inmates in the class.

       [2]Mr. Keyes states that "to the present day, certain men from that RDAP class and other
men on the prison yard treat me with disdain, disrespect, [and] insults, and I still am threatened
periodically whenever anyone brings into question my character and past criminal behavior and
past charges."

time" and she had "seen everything imaginable and nothing could surprise her."

Mr. Keyes continued to question Ms. Stucks about the statements in the treatment plan, as well as her authorization for disclosing it.  Documentation completed by Ms. Stucks at some point thereafter describe Mr. Keyes' behavior at this point as being "extremely disruptive and argumentative," although Mr. Keyes contends "this is a . . . false accusation made against me by [Ms.] Stucks in an attempt to cover up her own loss of self-control."  Mr. Keyes eventually drew a line through that portion of the treatment plan that he felt was incorrect, stating that he would refuse to sign a document containing incorrect information.  Ms. Stucks got angry and instructed the entire class, including Mr. Keyes, to sign their treatment plans regardless of whether they agreed with the accuracy of the information in them.  Mr. Keyes did sign his treatment plan, but added the notation "U.D." – for "under duress" – beneath his signature.   (Mr. Keyes points to another copy of the treatment plan in the record, claiming that it has been forged to include his signature without the "U.D." notation.) Ms. Stucks then expelled Mr. Keyes from that day's class, issuing him a "Negative Consequence" notice, reciting Mr. Stucks' perception of the events of that date.  The notice directed Mr. Keyes to: (i) write a five-page paper regarding "my inability or unwillingness to accept ownership of my criminal past," (ii) present that paper at the following class, and then to receive the comments of his fellow classmates about his behavior, and (iii) write a two-page paper addressing what he learned from his classmates' comments.  Mr. Keyes contends that, after he left the classroom, he looked in to see Ms. Stucks "jok[ing] and laugh[ing] at me and humiliat[ing] me in front of the other class participants."

As instructed by the Negative Consequence notice, Mr. Keyes wrote the five-page paper as instructed and read it to the class at the next session on October 23, 2008.  However, Mr.

Keyes purposefully omitted mention of the stalking and harassment charges, "refus[ing] to take ownership of and responsibility for the incorrect charges."  Mr. Keyes then awaited his fellow classmates' comments.  According to Mr. Keyes, those comments were "mostly . . . concerning my Christian faith," and that his classmates "were telling me how they did not like the fact that I would often make references to the Bible and the holy scriptures."  He states that Ms. Stucks did not intervene during the other inmates' comments.

After the class was over, Mr. Keyes went to Ms. Stucks' office to speak with her.  She stated that she was disappointed that his five-page paper did not address the stalking and harassment charges that they had previously discussed and her belief that he was "refusing to take ownership of and responsibility for" that conduct.  Mr. Keyes responded that he had taken responsibility for all of his actual convictions, but that he would continued to refuse to admit responsibility for conduct that he did not believe he was guilty of and for which he was not ultimately prosecuted.  Ms. Stucks responded that she did not care about the particular disposition of the charges and directed him to either take responsibility for the charges or else he would be issued another Negative Consequence notice.  Their discussion eventually became heated, and Mr. Keyes left Ms. Stucks' office.

On the next class session, October 27, 2008, Mr. Keyes began to read the two-page paper he had been instructed to write about his classmates' comments to him.  That paper began by acknowledging one classmates' observation that Mr. Keyes "struggle[s] with being able to listen to others as they speak without interrupting them," and Mr. Keyes confessed that flaw and promised to be mindful of it.  The remainder of the paper defended Mr. Keyes against the classmates' criticism of his reliance on Biblical quotations, with Mr. Keyes stating that "I will

make no apology for my stand as a Christian." He proceeded to quote a passage from the Bible and insisted that "There is only one truth." At about this point in time, Ms. Stucks "screamed" at Mr. Keyes that "that's enough" and to "sit down." Mr. Keyes apparently responded, equally energetically (both the his own quote set forth below and the preceding quote of Ms. Stucks one are rendered in all capital letters in his affidavit), that "I would not be forced to lie for her" about his prior charges. Ms. Stucks yelled at Mr. Keyes to "shut up" and "get out," and Mr. Keyes responded "loud enough for everyone in the RDAP classroom to hear me say to her over her outburst of rage" that he "came to class this morning to participate and to give an honest assessment of [his classmates' comments] and that I did not intend to quit." Mr. Keyes and Ms. Stucks continued to shout at each other until, as Ms. Stucks had been directing, Mr. Keyes left the room. Shortly thereafter, Ms. Stucks prepared paperwork indicating that Mr. Keyes was withdrawing from the RDAP class and "ordered" Mr. Keyes to sign it. Mr. Keyes claims he did as instructed so as to avoid any additional punishment.

Later, Mr. Keyes states that he was told by two other members of the class that, after he left, Ms. Stucks "was making denigrating, slanderous, insulting and belittling comments regarding my faith as a Christian," stating that he was " a religious fanatic," a "religious zealot," and that he was "hiding behind my religion so that I would not have to face my shame."

Based on these facts, Mr. Keyes purports to assert 10 claims: (i) that he was denied the opportunity to participate in the RDAP program, in violation of 18 U.S.C. § 3621(b), as a result of being forced to take responsibility for the inaccurate information in his PSI; (ii) his 8th Amendment rights were violated when Ms. Stucks released inaccurate information about him to the RDAP class, and then again, when Defendant Stucks "posted a stalking and harassment

charge and/or conviction concerning Mr. Keyes on a public board for all inmates to view" (as best the Court can determine, Mr. Keyes' affidavit does not address this latter event); (iii) that Ms. Stucks "created an inaccurate treatment plan" for him, based on her mistaken reading of information in his PSI and that Ms. Stucks continued to maintain inaccurate information in his inmate file, in violation of *Sellers v. Bureau of Prisons*, 959 F.3d 307 (D.C. Cir. 1992) and 5 U.S.C. § 522a; (iv) that Ms. Stucks released medical information about him – that he has hepatitis C – to other inmates without his consent, in violation of 5 U.S.C. § 522a, and further, that Ms. Stucks "formulated a medical treatment plan" for him even though she is not a licensed medical practitioner; (v) that Ms. Stucks and Defendant Krick have "produced, maintained, and manipulated a forged counterfeit treatment plan" – as opposed to a copy of the plan he signed with the "U.D." notation – in violation of 18 U.S.C. § 241, 242, and 1001(a); (vi) that Ms. Stucks and Mr. Krick improperly released information from his inmate file stating that he had stalking and harassment convictions, placing him at risk of harm from other inmates, in violation of BOP Program Statements 1351.05, 513.32, 513.40, and 3420.09; (vii) that Ms. Stucks deprived him of due process by expelling him from the RDAP program without an opportunity for a hearing; (viii) that Ms. Stucks violated his First Amendment right to free exercise of religion "by not allowing [him] the right to express his faith, belief, and/or religion" in violation of BOP Program Statements 1040.04 and 551.90; (ix) a claim that simply requests monetary damages; and (x) that Ms. Stucks and Mr. Krick engaged in "medical malpractice," in that they "made medical diagnosis and issued a treatment plan using inaccurate information from Mr. Keyes' PSI with no consultation with any past physician or mental health advisory," that neither of the Defendants "are licensed medical practitioners with the ability to diagnose or treat a physical ailment," and

that "at no time during treatment was therapy given for Mr. Keyes' behavioral issues."

The Defendants move **(# 38)** to dismiss each of Mr. Keyes' claims.  The Court will discuss the arguments the Defendants make with regard to each of the claims as part of its discussion herein.  Mr. Keyes did not file any response to the Defendants' motion.

## ANALYSIS

### A.  Standard of review

In considering Mr. Keyes' Amended Complaint, the Court is mindful of his *pro se* status, and accordingly, reads his pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, such liberal construction is intended merely to overlook technical formatting errors and other defects in his use of legal terminology and proper English.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve Mr. Keyes of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat him according to the same standard as counsel licensed to practice law before the bar of this Court.  *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

The Defendants seek dismissal of several of the claims, in part on the grounds that Mr. Keyes fails to state a claim under Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall*, 241 F.3d 1267, 1270 (10th

Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.

1997).  The Court must limit its consideration to the four corners of the Amended Complaint,

any documents attached thereto, and any external documents that are referenced in the Amended

Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th

Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter*

*Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

   In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544 (2007), the Supreme Court clarified what constitutes a "well-pleaded fact" for purposes of a

Rule 12 analysis.  A pleader is not required to set forth "detailed factual allegations," but must

offer more than "labels and conclusions," a "formulaic recitation of the elements of a cause of

action," or "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S.Ct. at 1949.

The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions," including "legal conclusion[s] couched as a factual allegation." *Id.* at 1949-50.

Moreover, the facts pled must demonstrate a claim that is more than just an abstract "possibility"

that the defendant has engaged in actionable misconduct. *Id.*  One way in which the Court might

conduct its analysis is to "identify[ ] pleadings that, because they are no more than conclusions,

are not entitled to the assumption of truth," and disregard them.  Then, faced with only well-

pleaded factual allegations, the Court "should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief." *Id.* at 1950.

### B.  Individual claims

Rather than address each of the claims individually enumerated by Mr. Keyes, some of which overlap to varying degree, the Court will group the claims by the key underlying facts, such that all claims allegedly cognizable because of a certain set of facts are addressed together.

### 1.  Claims relating to expulsion from RDAP program

Mr. Keyes' first claim contends that his expulsion from the RDAP constituted a violation of 18 U.S.C. § 3621(b); his seventh claim asserts that Ms. Stucks deprived him of due process by expelling him from the RDAP without allowing him a hearing.

18 U.S.C. § 3621(b) states, among other things, that the BOP "shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition."  Section 3621(e) specifically directs the BOP to institute RDAPs, and provides an incentive of potential reductions in sentences for inmates who successfully complete the program.  However, any sentence reduction is discretionary on the BOP's part.  18 U.S.C. § 3621(e)(2)(B); *Lopez v. Davis*, 531 U.S. 230, 241 (2001).  Thus, Courts considering whether an inmate has a liberty interest in participation in the RDAP or in the benefit of a reduced sentence for successful completion have concluded that no such liberty interest exists.  *Bennett v. Outlaw*, ___ F.Supp.2d ___, 2009 WL 3808528 *1-2 (E.D. Ar. Nov. 13, 2009) (slip op.); *Gibson v. Federal Bureau of Prisons*, 121 Fed.Appx. 549, 551 (5th Cir. 2004) (unpublished); *Kotz v. Lappin*, 515 F.Supp. 143, 148-50 (D.D.C. 2007).   Because Mr. Keyes does not have a liberty interest in his participation in the program, he cannot state a due process claim based on his expulsion from that program without a hearing.  *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) ("As for the Due Process Clause, standard analysis under that provision proceeds in two steps:

9

We <u>first</u> ask whether there exists a liberty or property interest of which a person has been deprived, <u>and if so</u> we ask whether the procedures followed by the State were constitutionally sufficient") (emphasis added).

Similarly, to the extent Mr. Keyes contends that § 3621(b) confers some statutory right to participate in the RDAP, this Court finds the contention to be without merit.  The Court is aware of no authority that construes § 3621(b) as conferring upon an inmate a private right of action based on expulsion from an RDAP program, much less based on the BOP's failure to offer any particular substance abuse treatment to that inmate.  Indeed, the nature and extent of substance abuse treatment that the BOP offers to a particular prisoner is a subject "left to the discretion of the Bureau of Prisons."  *U.S. v. King*, 101 Fed.Appx. 958, 959 (5th Cir. 2004) (unpublished). Second, assuming that the statute permits an inmate to claim monetary damages based on the BOP's failure to offer "appropriate substance abuse treatment," Mr. Keyes has not alleged facts showing that the BOP has not offered him <u>any</u> substance abuse treatment, but only that it has excluded him from treatment in the form of the RDAP.  Accordingly, Mr. Keyes' claims based on his expulsion from the RDAP fail to state a cognizable claim.

>2.  <u>Claims that disclosure subjected him to risk of attack</u>

Mr. Keyes's second claim purports to assert an 8th Amendment violation, in that Ms. Stucks' revealing of his prior charges for stalking and harassment exposed him to a risk of attack by fellow inmates.  His sixth claim asserts that he was improperly placed at risk of attack, based on violations of BOP Program Statements.

The 8th Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates, including protecting inmates from violence at the hands of other prisoners.

*Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).  An 8th Amendment claim premised upon prison officials exposing an inmate to a risk of violence requires pleading facts regarding two elements: (i) that, objectively, the inmate was exposed to a substantial risk of serious harm; and (ii) the official involved had, subjectively, the requisite culpable state of mind – namely, that the official both knew of and disregarded the risk of harm.  *Id.* at 834, 837.

Assuming, without finding, that Mr. Keyes has adequately alleged that Ms. Stucks' releasing of incorrect information about him to the RDAP class objectively exposed him to substantial risk of serious harm from other inmates, Mr. Keyes has not alleged any facts that would show that Ms. Stucks was subjectively aware that her actions would pose such a risk.  Mr. Keyes alleges that Ms. Stucks had previously been employed as a prison guard, but at best, this allegation establishes only that Ms. Stucks <u>might</u> have known (or even <u>should</u> have known) that inmates may attack other inmates who have been charged with or convicted of certain crimes. But the subjective element requires more: Mr. Keyes must allege facts that show both that Ms. Stucks was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he must allege facts showing that she "also dr[e]w that inference." *Farmer*, 511 U.S. at 837.  In other words, if Ms. Stucks "failed to alleviate a significant risk that [she] should have perceived by did not," liability under the 8th Amendment does not lie.  *Id.* at 838.   Thus, without an allegation of facts that show that Ms. Stucks <u>actually</u> recognized that disclosure of Mr. Keyes' prior charges put him at risk of attack, Mr. Keyes' 8th Amendment claims fail.  The Court has examined Mr. Keyes' extended affidavit and finds nothing therein that would suggest that Ms. Stucks did indeed recognize the potential consequences of her

alleged disclosure of Mr. Keyes' charges.[3]  Thus, Mr. Keyes' second claim for relief is dismissed.

As to Mr. Keyes' contention that violation of BOP Program Statements regarding confidentiality of inmate information also placed him at risk, this is largely a restatement of his 8th Amendment claim, and is deficient for the same reasons.  Mr. Keyes' claims are premised on *Bivens* – in other words, his claims must be premised upon a violation of some right secured to him by the U.S. Constitution.  *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  Violation of the Program Statements themselves does not give rise to *Bivens* liability unless that violation also amounts to a constitutional violation.[4]  Thus, Mr. Keyes' sixth claim for relief is also dismissed.

_____

[3]Admittedly, circumstantial evidence of the fact that a prison official <u>must have</u> known of a risk can be sufficient to demonstrate this element.  For example, in *Farmer*, the Supreme Court explained that "evidence showing that a substantial risk of inmate attacks as longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, [coupled with] circumstances suggest[ing] that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it," might be enough to plead the subjective element.  *Id.* at 842-43.  Mr. Keyes' allegations do not reach this level.  The fact, that, according to Mr. Keyes, Ms. Stucks claimed to have been a prison guard "for a long time" does not suffice to establish her knowledge that risks of inmate-on-inmate assaults are "longstanding, pervasive, well-documented, or expressly noted" by officials at the facility where Mr. Keyes was housed.  Notably, the assaults Mr. Keyes recounts occurred in prisons elsewhere, and Mr. Keyes does not identify the facilities where Ms. Stucks was a guard, much less indicate whether inmate-on-inmate assaults there were especially notable.   Moreover, even if Ms. Stucks knew that inmate-on-inmate assaults are common, Mr. Keyes has not come forward with evidence of her subjective understanding that charges of "stalking" and "harassment" are the kind that, if known by other inmates, would be the type of charges that would cause other inmates to assault him

[4]In any event, the operative provisions of the cited Program Statements reference the confidentiality of inmate records premised on privacy grounds, not for the purpose of protecting inmates against assaults.  Thus, claims that the Defendants' actions violated Program Statements more properly fall within the category of (and are ultimately subsumed by) Mr. Keyes' Privacy Act claims.

3.  <u>Claims based on breach of privacy rights</u>

Several of Mr. Keyes' claims are premised on violations of the Privacy Act, 5 U.S.C. §

522a *et seq.*  His third claim for relief contends that the Defendants maintain an inmate file with

inaccurate information about him; his fourth claim alleges an unauthorized disclosure of his

medical history in violation of the Act; his fifth claim asserts that the Defendants are maintaining

a forged document in his inmate file, and his sixth claim for relief asserts, in part, that Ms.

Stucks improperly disclosed private information about him.

The Privacy Act contains restrictions on how agencies maintain and disseminate records

and information.  Among other things, the Act: (i) requires that records not be disclosed, except

pursuant to a written request by the individual the record concerns, subject to numerous

exemptions, 5 U.S.C. § 522a(b); and (ii) requires that agencies "maintain all records . . . with

such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure

fairness," § 522a(e)(5).  However, the Act permits certain agencies – including those involving

law enforcement and corrections – to exempt certain records from the scope of the Privacy Act.

5 U.S.C. § 522a(j)(2).

As to Mr. Keyes' contention that the BOP has failed to maintain accurate records, the

Court finds that this claim fails for both legal and factual reasons.  The BOP has expressly

invoked the right under the Act to exempt records maintained in its Inmate Central Records

System, including inmate health records and security records, from the requirement that they be

accurate.  28 C.F.R. § 16.97(a), (j).  Thus, records in the BOP's Central Records System are

exempt from the provisions of § 522a(e)(5) (requiring efforts to maintain accuracy); *Miller v.*

*Federal Bureau of Prisons*, 703 F.Supp.2d 8, 15 n. 3 (D.D.C. 2010).  Mr. Keyes' affidavit

makes clear that his complaint about inaccurate records relates to the BOP "fail[ing] to update my Central File in re: the stalking and harassment issues."  Thus, because this claim concerns records in his Central File, Mr. Keyes fails to state a claim for a Privacy Act violation under §522a(e)(5).

The same rationale does not appear to apply with regard to Mr. Keyes' claim of improper disclosure.  As noted above, § 522a(b) prohibits an agency from "disclos[ing] any record . . . to any person . .  except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  Although the Act allows agencies to exempt records from certain requirements, the Act specifically provides that agencies cannot exempt records from the requirement of subsection (b).  5 U.S.C. § 522a(j) ("The head of any agency may promulgate rules . .  to exempt any system of records within the agency from any part of this section except subsection[ ] (b). . .").  As a result, 28 C.F.R. § 16.97 does not purport to exempt BOP records from § 522a(b).  Thus, to the extent that Ms. Stucks disseminated records concerning Mr. Keyes to others without Mr. Keyes' consent, a claim for breach of the Privacy Act may lie.

Mr. Keyes' fourth claim for relief contends that Ms. Stucks revealed information from the BOP's medical records about him – the fact that he has hepatitis C – to other inmates.  Mr. Keyes has supplied the Court with a copy of the treatment plan that was discussed at the October 20, 2008 RDAP class, and that plan does indeed indicate that Mr. Keyes "ha[s] contracted Hepatitis C during the height of [his] drug addiction."  That plan also discloses Mr. Keyes' prior stalking and harassment charges, as alleged in his sixth claim.  Mr. Keyes' affidavit is not entirely clear as to whether this treatment plan was provided only to him, or whether copies of it

14

were distributed to other inmates.  Taking the allegations in the Amended Complaint in the light most favorable to Mr. Keyes, the Court will assume that Mr. Keyes has alleged that the plan was indeed shared with other inmates in the class.  *See Docket* # 9, p. 7 (treatment plan was "available for all inmates to view").  Thus, because Mr. Keyes has apparently alleged facts sufficient to plead claims four and six, insofar as each alleges a violation of 5 U.S.C. § 522a(b), the Court denies Ms. Stucks' motion in this regard.

### 4.  First Amendment claim

Mr. Keyes alleges that Ms. Stucks "violated [his] right to religious freedom" guaranteed in the First Amendment "by not allowing [him] the right to express his faith. belief, and/or religion."   Presumably, this is an attempt to invoke the First Amendment's "free exercise" clause.

To allege a free exercise claim in the prison context, Mr. Keyes must allege that Ms. Stucks "substantially burdened his sincerely-held religious beliefs."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  If he does so, Ms. Stucks can then identified "the legitimate peneological interests that justified the impinging conduct," and the Court then assesses those peneological interests under the *Turner* factors.  *Kay v. Bemis*, 500 F.3d 1214, 1218-19 (10th Cir. 2007), *citing Turner v. Safley*, 482 U.S. 91 (2007).  Here, Mr. Keyes' affidavit, taken in the light most favorable to him, indicates that he has alleged acts by Ms. Stucks that "substantially burdened" his exercise of his Christian beliefs.

The record indicates that Ms. Stucks required Mr. Keyes to listen to the complaints raised by his RDAP classmates on October 23, 2008, and then to write a two-page paper responding to those concerns.  Mr. Keyes contends that the bulk of the complaints by his classmates concerned

his citations to the Bible as part of his therapeutic discussions, and Mr. Keyes' two-page paper indeed notes his vocal devotion to Christian principles as one of the complaints his classmates raised.  Mr. Keyes contends that, when he began reading this portion of his paper, Ms. Stucks cut him off and ordered him out of the class.  Thus, it appears that Mr. Keyes has adequately alleged that his belief in being a vocal proponent of his religious beliefs was substantially burdened by Ms. Stucks' refusal to allow him to address those beliefs in the context of discussing his failings and rehabilitation during the RDAP class.  This is sufficient to carry Mr. Keyes' pleading burden.  Although Ms. Stucks may ultimately be able to carry her own burden of identifying a legitimate peneological justification for preventing discussion of religious beliefs during RDAP classes, she has not yet done so, and thus, the Court declines to dismiss Mr. Keyes' eighth claim for relief.

5.  <u>Medical malpractice claims</u>

Finally, the Court turns to Mr. Keyes' claims that both Defendants engaged in "medical malpractice" by purporting to devise treatment plans for him without proper certification or by drafting plans that failed to properly assess his various conditions.  This contention appears in both his fourth and tenth claims.

Construing this claim as a non-constitutional[5] tort claim, this Court permitted the United States to be substituted **(# 37)** for the Defendants for purposes of these claims.  The United States contends that Mr. Keyes failed to exhaust this claim as required by the Federal Tort Claims Act.  28 U.S.C. § 1346(b).  *See* 28 U.S.C. § 2675(a) (setting forth pre-suit exhaustion requirement).

---

[5]Courts have regularly concluded that allegations of mere medical malpractice are not actionable as constitutional claims under the 8th Amendment.  *See e.g. Estelle v. Gamble*, 429 U.S. 97, 106 n. 14 (1976).

16

The failure to exhaust a claim under the Act is jurisdictional, and thus, the Court has the power to take evidence on the question of whether the jurisdiction predicate is satisfied. *Boehme v. U.S. Postal Serv.*, 343 F.3d 1260, 1262 (10th Cir. 2003) (requirement is jurisdictional); *Sizova v. National Institute of Standards and Technology*, 282 F.3d 1320,1324 (10th Cir. 2002) (court may receive evidence on motion to dismiss challenging jurisdiction).

Here, the United States has come forward with an affidavit of Theresa Montoya, stating that Mr. Keyes never filed a notice of claim for tort damages arising from medical malpractice. Mr. Keyes has not responded with evidence of his own, and thus, the Court deems Ms. Montoya's contention to be undisputed. Accordingly, the Court finds that it lacks jurisdiction over Mr. Keyes' purported medical malpractice claims, and thus, those claims are dismissed without prejudice.

To the extent the Court has not specifically addressed some portion of one of Mr. Keyes' claims above, the Court finds that Mr. Keyes has failed to plead facts sufficient to state any other cognizable claim he purports to assert. Thus, the only surviving claims are: (i) Mr. Keyes claim for violation of the Privacy Act, 5 U.S.C. § 522a(b), with regard to the unauthorized disclosure of his records to others, and (ii) his claim for violation of his First Amendment right to free exercise of his religion.

### C. Qualified immunity

With regard to the claims for which Mr. Keyes has stated a claim, Ms. Stucks – the only Defendant against whom such claims are cognizable – contends that she is entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages if their alleged conduct did not violate clearly established statutory or

constitutional rights of which a reasonable person would have known at the time of the conduct. *Pearson v. Callahan*, 129 S.ct. 808, 815 (2009).   Because the Court has concluded that Mr. Keys has stated two cognizable claims, it turns to the question of whether the rights implicated were "clearly established" at the time.

For the law to be "clearly established," there ordinarily must be Supreme Court or Tenth Circuit precedent acknowledging the existence of such a right in the particular circumstances presented, or the "established weight of authority" from other circuits must recognize the legal right at issue.  *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010).  It is not necessary for the precise factual scenario to be presented in a prior case, so long as the constitutional rule identified in the decisional law "appl[ies] with obvious clarity."  *Id.*  Mr. Keyes bears the burden of identifying the precedent that clearly establishes the particular rights he asserts.  *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010).

Mr. Keyes has not responded to Ms. Stucks motion, and thus, by definition, has not cited the Court to any Supreme Court or 10th Circuit precedent clearly establishing the rights he invokes in the particular circumstances herein.  Mr. Keyes' Amended Complaint makes a passing reference to *Sellers v. Bureau of Prisons*, 959 F.3d 307 (D.C. Cir. 1992) in discussing his Privacy Act claim, but *Sellers* does not involve improper dissemination of inmate records under 5 U.S.C. § 522a(b), and thus, does not clearly establish that Ms. Stucks should have been aware that disclosing Mr. Keyes' medical condition and prior record of charges to classmates in a therapeutic RDAP class might constitute a violation of that Act.

The Court declines to attempt to carry Mr. Keyes' burden for him by seeking to locate supporting precedent.  In the absence of a response by Mr. Keyes, the Court concludes that he

18

has failed to carry his burden of overcoming Ms. Stucks' qualified immunity, and thus, the

Privacy Act and First Amendment claims against Ms. Stucks are dismissed on the grounds of

qualified immunity.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss **(# 38)** is **GRANTED**, and

all claims in this action are **DISMISSED** for the reasons stated forth herein.  The Clerk of the

Court shall close this case.

Dated this 23rd day of March, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

19